IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN R. JEHLING,

        Plaintiff,                                  05cv1174

    v.                                       **Electronically Filed**

MELLON BANK, N.A., ET AL.,

        Defendants.

### Memorandum Opinion on Summary Judgment

**I.**    **Introduction**

This is an action in employment discrimination. Plaintiff, John Jehling ("Jehling"), alleges that Mellon Bank, N.A. and Mellon Financial (collectively "Mellon"), discriminated against him in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 42 Pa. Stat. § 951, *et seq.*, when he was eliminated as a part of a corporate reorganization/reduction-in-force (RIF).

Defendants have filed a motion for summary judgment (doc. no. 37) arguing that plaintiff cannot establish that he was replaced by a similarly situated, sufficiently younger person, or that defendant's legitimate nonscriminatory reasons for eliminating his position were a pretext for discrimination. For the reasons that follow, this Court will grant defendants' motion for summary judgment.

**II.**    **Facts**

The parties have set forth more than 68 pages of material facts. The facts, many of which are disputed, but most of which are not "material", may be fairly summarized as follows.

Jehling, who was born on November 10, 1947 and was 56 years old at the time of termination, was hired by Mellon in 1998 as a first vice president and team leader to manage

underwriting for Mellon's institutional banking department. In 1999, the institutional banking, corporate banking and middle market departments reorganized into two departments - large corporate and loan products. Large corporate handled the "relationship" side of the business and loan products handled the underwriting and credit.

Effective January 1, 1999, Mellon separated the marketing and underwriting functions of the institutional banking department into two separate areas, and as a result, plaintiff became the head of the loan underwriting group, and he was reassigned to report to Mr. Richard Arrington ("Arrington"), who was the head of the loan products department (later changed to the global exposure department). Arrington was born on September 30, 1959, and was forty-five years old at the time of plaintiff's termination in 2004.

In 2002, Jehling played a role in establishing a new group within Mellon's loan products department (GEM) known as the portfolio management group. The GEM was set up to purchase and monitor credit derivatives (insurance taken out on loans to large corporations) as well as to monitor Mellon's loan portfolio. In September 2002, Arrington offered plaintiff a new position as the director of portfolio management.[1]

From 2002 through 2004, plaintiff received favorable performance reviews from Arrington for his work as the head of the portfolio management group.

In the fall of 2004, as a result of a restructuring and reoganization of another department, global institutional clients (GIC), and Mellon's desire to reduce expenses in GEM, Arrington

---

[1]There are facts in dispute regarding certain personnel problems and negative performance reviews involving plaintiff between 1999 and 2001. However, this Court will not address them because such facts are not material to the dispute at hand because they are not relevant to Mellon's stated reasons for plaintiff's termination - a reduction in workforce.

decided to restructure GEM. Arrington discussed his decisions with and they were approved by his supervisor, John Chesko. Chesko was born on March 15, 1949 and was 54 years old at the time of plaintiff's termination. Ultimately, it was determined that the GIC department would be disbanded and portions of that department would be consolidated into GEM. Mellon carried out a reorganization of its GEM and as part of that reoganization, the Philadelphia, Los Angeles and London offices were closed.

Mellon alleges that the purpose of the reorganization was to reduce expenses by two million dollars. Plaintiff disputes that fact and states that in Jehling's 2004 performance evaluation (drafted by Arrington after his termination), Arrington did not cite expense reduction as the reason for Jehling's termination. However, the parties agree that Arrington claimed that as a result of "a strategic review of how and when derivatives will be purchased," the portfolio management group was reorganized and plaintiff's position was eliminated.

Mellon alleges that Arrington decided to combine plaintiff's job duties, which would not justify a full-time position, with those of Ed McGrath ("McGrath"), which were more than one full-time position, and to reassign some of McGrath's job duties to another position. McGrath was born on April 5, 1947 and was 56 years of age at the time of plaintiff's termination. Arrington testified that he determined that "it would be easier for Ed McGrath to come up to speed on portfolio management than it would be for John Jehling to assume responsibility for Mellon Canada and Banco Brascan, and I also thought that Ed McGrath would do a better job." (doc. no. 39, at 10, ¶ 52).

According to Mellon, the "lion's share of [p]laintiff's previous job responsibilities were assumed by Ed McGrath. Specifically, Mr. McGrath assumed overall group head responsibility

and accountability for portfolio management as the manager of that group." (doc. no. 39, at 11, ¶ 56. In addition, according to Mellon, some of plaintiff's job responsibilities were assumed by other individuals including Barbara Michael, who assumed responsibility for preparing certain reports; Susan Whitewood, who assumed responsibility for organizing Bloomberg training; and David Hritz (Hritz), who assumed responsibility for "some minor portfolio management duties." (doc. no. 39, at 11, at ¶ 57).

Plaintiff, however, disputes these contentions and claims that he was not replaced by McGrath, but rather, Arrington "essentially replaced Jehling with Hritz." (doc. no. 41, at 23, ¶ 51). At the time of his alleged replacement, Hritz was 50 years old, and thus, was 6 years younger than plaintiff. According to plaintiff, the evidence supporting his belief that Hritz replaced him was the fact that Jehling introduced Hritz as his replacement to others in front of both Hritz and McGrath and neither of them corrected him. Also, according to plaintiff, the essential responsibilities of Hritz's job are nearly identical to his and plaintiff helped to train Hritz as his replacement.

Following the reorganization, Hritz became the managing director of portfolio management and he reports to McGrath, the group head of Mellon Canada, portfolio management and Banco Brascan. In this role, Hritz executes credit derivatives when needed and provides some market reporting, duties which were previously performed by plaintiff and other members of the previous portfolio management group.

While Mellon alleges that most of Hritz's overall job responsibilities were newly created in the department, plaintiff argues that Hritz's "essential job duties" are nearly identical to plaintiff's "essential job duties."

According to Mellon, in the newly configured GEM department, McGrath became the group head for Mellon Canada, portofolio management, and Banco Brasca, meaning that he was responsible for managing other employees in the group. Further, Mellon contends that Hritz never functioned as *the* head of a group in the GEM department. Plaintiff disputes that contention and states that Hritz "is considered *a* head of the group in the GEM department." (doc. no. 41, at 31, ¶ 61). (emphasis added).

Mellon contends that in considering how to fill the position now performed by Hritz, Arrington considered multiple candidates and plaintiff. Arrington testified that in deciding who to place in the position, he "looked at that position and the requirements [he] thought that position would involve and tried to match what [he] perceived as strengths and weaknesses of various candidates against those job requirements." (doc. no. 39, at 12, ¶ 62). Arrington further testified that plaintiff would have a difficult time doing what Hritz does because plaintiff and another employee, Carl Tabacjar, struggled in adapting a "Lauchpad" program (a computer program which tracks Mellon's loan portfolio on a "real time" basis) to Mellon's uses, while Hritz was able to "take the Launchpad capability and greatly expand it so that it has become a portfolio management tool well beyond what Mellon had been using it for." (doc. no. 39, at 12, ¶ 64, and doc. no. 40, at 4, ¶ 16). Again, plaintiff disputes that contention and states that Arrington replaced plaintiff in the portfolio management group with Hritz, who plaintiff characterizes as a younger, less experienced, and more expensive employee (according to plaintiff, Hritz was paid $7,000 more than him). (doc. no 40, at 9, ¶ 34). Plaintiff notes that his performance review in 2003 was outstanding, and he received numerous compliments about his 2003 performance and further alleges that Arrington opinion regarding the Lauchpad explanation

5

"is a baseless post hoc justification for the litigation." (doc. no. 41, at 35 ¶ 64).

The parties agree that Arrington's ultimate decision to eliminate plaintiff's position was not made until very late in the reorganization process. In fact, as late as October 7, 2004 and October 13, 2004, Arrington was still planning to retain plaintiff after the reorganization. However, Arrington ultimately decided to discharge plaintiff on October 22, 2004, and this decision was approved by Arrington's superior, Chesko.

While Mellon contends that plaintiff's discharge was motivated by an effort to reduce the overall expenses for GEM, that individual salaries were not a consideration, and that plaintiff's position was eliminated, plaintiff argues that Hritz was actually paid more than him, and that his position was not eliminated, but rather, he was replaced by Hritz.

On October 29, 2004, Arrington and Diane Cafaro ("Cafaro"), a Human Resources representative, contacted plaintiff, who was on vacation and off-site at the time, and informed him that his position was going to be eliminated as part of the reorganization. According to plaintiff, Arrington also stated that plaintiff was terminated in order to reduce the number of group heads in Pittsburgh, however, the "actual number of group heads overall did not decline as a result of the reorganization." (doc. no. 41, at 42, ¶ 74). Plaintiff's age was not mentioned as a factor during that meeting and the parties obviously dispute whether age was a factor in making the displacement decisions.

At the meeting on October 29, 2004, Arrington and Cafaro informed plaintiff that if he continued to work for Mellon until his anticipated separation date, he would receive a severance package and would still qualify for his 2004 bonus. Following his termination, plaintiff was given (or earned) a bonus for his work in 2004, albeit a smaller bonus than what plaintiff believes

he was entitled.

While Mellon contends that prior to the reorganization, the average age of all employees in the GEM department was 48.3 years, and following the reorganization, the average age of the retained employees in the GEM department was 47.6, plaintiff counters that the average age of retained employees in the GEM was 46 years of age while the average age of the displaced employees was 50 years of age.

### III.     Standards of Review

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted). In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-

moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004.)  *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party ).

**IV.     Discussion**

In analyzing a claim for unlawful termination under the ADEA,[2] we apply the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this scheme: (1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and, (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508 (1993).

To establish a prima facie case of age discrimination in a reduction-in-force case, plaintiff must show that: (1) he is forty or older; (2) he is qualified for the position in question; (3) he suffered an adverse employment decision; and (4) a similarly situated, sufficiently younger employee was retained.  *Anderson v. Consolidated Rail Corp*., 297 F.3d 242, 250 (3d Cir. 2002)("to present a prima facie case raising an inference of age discrimination in a reduction in force situation, the plaintiff must show, as part of the fourth element, that the employer retained someone similarly situated to him who was sufficiently younger.")

The parties dispute whether plaintiff can establish the fourth element above.  The crux of the dispute hinges on the question of who assumed plaintiff's job duties upon his termination. While plaintiff alleges that Hritz (who was 52 years old at the time of the reorganization and is

---

[2] In *Allegheny Housing Rehabilitation Corp. v. PHRC*, 532 A.2d 315, 317-19 (Pa 1987), the Supreme Court of Pennsylvania adopted for PHRA cases the respective burdens of production and proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Accordingly, this Court will treat plaintiff's PHRA claim as coextensive with his federal ADEA claim.

only six years younger than plaintiff) replaced him, Mellon contends that McGrath (who was six months older than plaintiff) assumed the largest share of plaintiff's duties.  Mellon also argues that Hritz is neither sufficiently younger nor is he similarly situated to plaintiff and that the age difference between plaintiff and Hritz is insufficient to establish a prima facie case.

When viewing the facts in the light most favorable to plaintiff, as the non-moving party, this Court concludes that plaintiff has failed to show that a sufficiently younger and similarly situated employee replaced him.  This Court finds that no reasonable jury could find that Hritz replaced plaintiff.  The parties agree that following the reorganization, McGrath was made the group head of Mellon Canada, portfolio management, and Banco Brascan.  When McGrath assumed the overall management responsibilities for portfolio management, he assumed the predominant share of plaintiff's job responsibilities that survived the reorganization.  Further, it is undisputed that plaintiff's position - that of portfolio management group head was eliminated and no one has served in that position since plaintiff was terminated.  For these reasons, this Court finds that no reasonable jury could find that plaintiff was replaced by Hritz, but rather, that he was replaced by McGrath, who was actually six months older than plaintiff.

However, even assuming for the sake of argument that Hritz replaced plaintiff, this Court finds that Hritz, being only 6 years younger than plaintiff, is not sufficiently younger than plaintiff under the fourth element of the prima facie standard.

Although the Court of Appeals for the Third Circuit has not yet established a bright line rule regarding the age difference that will satisfy the "sufficiently younger" element, it has found that absent other evidence, an age difference of as much as seven years is not sufficient to support an inference of discrimination.  *See Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333

n. 9 (3d Cir. 2000)(56 year old failed to set forth a prima facie case where employer hired a 54 year old and a 49 year old instead of her because those ages did not "differ materially" from hers).  Further, courts within this circuit and other circuits have also held that age differences of six years does not support the "sufficiently younger" standard.  *Gutknecht v. SmithKline Beecham Clinical Labs, Inc.*, 950 F.Supp. 667, 672 (E.D. Pa. 1996)(when a replacement is fewer than five or six years younger, the replacement is not sufficiently younger and therefore no prima facie case is presented); *Bernard v. Bethenergy Mines, Inc.*, 837 F.Supp. 714, 716-17 (W.D. Pa. 1993)(six or seven years younger is not sufficiently younger); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998)(41 year old not sufficient younger than 46 year old); *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998)(seven year age diffference is an "presumptively insubstantial gap").

      Accordingly, because plaintiff has failed to set forth the fourth element necessary to demonstrate a prima facie case of age discrimination, his ADEA and PHRA claims fail as a matter of law.

      However, even assuming arguendo that plaintiff could establish a prima facie case of age discrimination, defendants have met their burden of establishing legitimate, nondiscriminatory reasons for terminating plaintiff as part of a well planned and well documented reorganization, *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)(citing *McDonnell Douglas*, 411 U.S. at 802), and plaintiff has offered no evidence to suggest that the reorganization generally or plaintiff's termination specifically was a pretext for age discrimination.  Thus, under the final prong of the *McDonnell Douglas* analysis, plaintiff has failed to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendants' proffered legitimate reasons

such that a "reasonable fact-finder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reasons did not actually motivate" defendants' action. *Fuentes* at 764-65 (quoting *Ezold*, 983 F.2d at 531).[3]

An appropriate order follows.

                            s/Arthur J. Schwab
                            Arthur J. Schwab
                            United States District Judge

cc:    All counsel of record

---

[3] The fact that prior to the reorganization, the average age of all employees in GEM was 48.3 years, and following the reorganization, the average age of the retained employees in GEM was 47.6 is evidence that the reduction in the overall age of the workforce was insignificant.